# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

JEFFERY O. THOMAS,

                     Plaintiff,

       v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                  Defendant.      Case No. 4:12-cv-00004-SLG

## DECISION AND ORDER

Jeffery Thomas initiated this Social Security action in federal District Court after exhausting his administrative remedies.[1] The matter has been fully briefed by the parties.[2] For the reasons set forth below, this matter is REVERSED and REMANDED to the Commissioner for further proceedings consistent with this decision.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Thomas filed an application for disability insurance benefits with the Social Security Administration on June 23, 2009 and an application for supplemental security income on January 13, 2010.[4] Mr. Thomas alleged a disability onset date of July 1, 2005.[5] He asserted that he had balance problems, slurred speech, vision problems, and damage to [his] nervous system," and that "these problems are getting worse each year."[6] Both

---

[2] Docket 17 (Thomas' Br.); Docket 18 (Def.'s Br.); Docket 19 (Reply).

[4] Administrative Record at 16 [hereinafter A.R.].

[5] A.R. 16; *see also* A.R. 83.

[6] A.R. 82.

applications were initially denied by the agency.[7] His subsequent request for a hearing before an Administrative Law Judge (ALJ) was granted, and a hearing lasting approximately 40 minutes was held on December 8, 2010.[8] At the hearing, Mr. Thomas testified on his own behalf. He was not represented by an attorney. An independent vocational expert also testified.

At the time of the hearing, Mr. Thomas was 41 years old.[9] He indicated he is unmarried and lives with his 13 year-old child.[10] He stated that he cooks, cleans and shops for groceries.[11] He indicated that grocery shopping is difficult because the fluorescent lighting affects his balance.[12] Mr. Thomas also testified that he does not have any problem driving.[13]

Mr. Thomas testified that he had worked as a construction equipment mechanic with Great Northwest from 1997 until July 1, 2005. During those years, his annual income ranged from approximately $37,000 to over $84,000.[14] Initially, he was a regular mechanic, but was

---

[7] A.R. 82.

[8] A.R. 82.

[9] A.R. 60.

[10] A.R. 456.

[11] A.R. 456.

[12] A.R. 457.

[13] A.R. 457.

[14] A.R. 73.

eventually promoted to the master mechanic of the shop.[15]  His work included welding and line boring.[16]  He testified that he left Great Northwest because he developed a problem with his eyes and "couldn't see the computer any more."[17]  He indicated that doctors could not find out what was wrong with him.[18]  The medical records in the file showed that Mr. Thomas had several emergency room visits because of lost vision in his right eye in the fall of 2005.[19]

After he left Great Northwest in July 2005, Mr. Thomas did part-time excavation work and temporary jobs including "handyman stuff . . . yard cleaning and foundation work" until approximately 2008.[20]  At the time of the hearing in December 2010, Mr. Thomas testified he had not done any of this work for at least one and a half years, explaining that "Once I found out what was going on, I just kind of said no more." [21]  He added "I knew I was having a lot of problems, but I couldn't find a doctor to pinpoint what it was."[22]

Mr. Thomas believes that the fumes he inhaled when he worked at Great Northwest have caused his symptoms.[23]  He testified to suffering from mental ailments including severe

---

[15] A.R. 463.

[16] A.R. 462, 463.

[17] A.R. 463.

[18] A.R. 463.

[19] A.R. 168, 200, 203.

[20] A.R. 446.

[21] A.R. 447.

[22] A.R. 447.

[23] A.R. 448, 449, 71-72.

short-term memory loss,[24] as well as physical impairments including issues with his nerves,[25] weakness and pain in his wrists and entire body,[26] severe vertigo,[27] severe cold sensitivity,[28] poor vision,[29] and strength problems.[30]  He testified the nerves in his body hurt, and that he feels pain at a level of eight on a scale of one to ten.[31]  He further testified that because of his nerve pain, he has trouble sleeping and often wakes up in the middle of the night in pain.[32]  He testified that he does not have any problems with walking,[33] but that he cannot sit still and needs to move around about every twenty minutes while sitting.[34]

Mr. Thomas indicated that he has relied primarily on holistic medicine to address his symptoms and has undergone heavy metal detoxification treatment for several years.[35]  He

---

[24] A.R. 449.

[25] A.R. 448.

[26] A.R. 450.

[27] A.R. 450.

[28] A.R. 451.

[29] A.R. 451.

[30] A.R. 452.

[31] A.R. 453.

[32] A.R. 454.

[33] A.R. 455.  *But see* A.R. 132 (Function Report completed by Mr. Thomas, dated Jan. 25, 2010, indicating that "walking is fine, balance is difficult.").

[34] A.R. 455.

[35] A.R. 448.

testified that these treatments cause his body to pulsate and worsen his eyesight.[36]   The health care records reflect that Mr. Thomas received treatment and regular lab work from naturopath Lisa Del Alba, N.D., beginning in early 2008, and naturopath Amy Derksen, N.D., beginning in November 2009.   The record contains two reports from Dr. Derksen, dated December 15, 2009 and December 9, 2010, describing Mr. Thomas' symptoms of fatigue, vertigo/dizziness, bilateral neuropathies of the upper and lower limbs, balance and coordination issues, and cognitive deficits.[37]   Dr. Derksen's reports contain a diagnosis of heavy metal toxicity.[38]   Dr. Del Alba's notes in the record reflect the same symptoms and diagnosis and include several lab results which Dr. Del Alba interpreted as indicative of the presence of heavy metals in Mr. Thomas' system.[39]   At the time of the hearing, the record indicates that Mr. Thomas was taking ten different over-the-counter medicines for "heavy metal detox."[40]   The naturopaths are the only two health care providers identified in the record who have provided treatment to, as opposed to merely examining, Mr. Thomas since October 2005.

---

[36] A.R. 450-51.

[37] A.R. 375, 391.

[38] A.R. 375, 391.

[39] A.R. 229-335.

[40] A.R. 105.

The administrative record indicates that Mr. Thomas filed a claim for workers' compensation benefits at some point in 2009.[41] In that claim, he alleged that his "illness happened from breathing toxic fumes in the [Great Northwest] shop without proper ventilation."[42]

Elizabeth Kohnen, M.D., M.P.H., was retained by the Social Security Administration to evaluate Mr. Thomas. In her report dated November 25, 2009, she described Mr. Thomas' delivery of his medical history as "somewhat difficult to follow sometimes" and opined that he had "neurologic/cognitive defects that may or may not have been associated with the [alleged fume] exposures."[43] She assessed Mr. Thomas' vision as 20/30 in the right eye and 20/25 in the left eye.[44]

Dean Zuelsdorf, Psy.D., was retained by the Social Security Administration to complete a consultative psychological evaluation of Mr. Thomas. In his report dated December 5, 2009, he diagnosed Mr. Thomas with a cognitive disorder and severe short-term memory deficits and recommended a complete neuropsychological battery of tests to assess possible brain damage.[45] There is no indication in the record that these tests were conducted.

---

[41] A.R. 71-72.

[42] A.R. 71.

[43] A.R. 342.

[44] A.R. 25 (referring to A.R. 342).

[45] A.R. 353.

Jordan Firestone, M.D., Ph.D., M.P.H., an attending physician at Harborview Medical Center in Seattle and Board-certified neurologist, conducted an independent medical exam of Mr. Thomas on February 25, 2010.[46]   The exam was requested by Great Northwest's insurers to investigate Mr. Thomas' workers' compensation claim.  Specifically, Dr. Firestone was "asked to opine regarding the potential association between Mr. Thomas' symptom complex and his work at Great Northwest Incorporated."[47]   In addition to a full neurological evaluation, including a follow-up MRI, Dr. Firestone reviewed Mr. Thomas' lab results and "did not find any evidence that [Mr. Thomas] ha[d] been poisoned by metal exposures at work."[48]   Instead, Dr. Firestone diagnosed Mr. Thomas with multiple sclerosis (MS), and wrote in his report that the "brain MRI scan shows findings that are classic for multiple sclerosis."[49]   The MRI report and other underlying test results are not in the record.  Dr. Firestone gave Mr. Thomas materials on MS and encouraged him to seek treatment for that condition.[50]

Dr. Arthur Lewy, Ph.D., completed a mental residual functional capacity (RFC) assessment of Mr. Thomas for the Social Security Administration on December 8, 2009.[51]

---

[46] A.R. 393.

[47] A.R. 393.

[48] A.R. 399-400.

[49] A.R. 399.

[50] A.R. 400.

[51] A.R. 369-71; Docket 17 at 14.

The RFC was based on Dr. Lewy's review of the file; he did not examine Mr. Thomas. Dr. Lewy characterized Mr. Thomas as "markedly limited" in his "ability to interact appropriately with the general public."[52] At the hearing, the ALJ questioned Mr. Thomas about his ability to interact with people:

> Q: "Do you have any problems with people in general?"
>
> A: "No."
>
> Q: "Getting along with them or anything like that?"
>
> A: "No."[53]

The ALJ did not include Dr. Lewy's limitation in his RFC calculation.

At the hearing, the ALJ posed hypothetical questions to an independent vocational expert. The expert testified that a hypothetical person of Mr. Thomas' same age, education, and work experience with the limitations described by the ALJ would not be able to perform Mr. Thomas' past work.[54] Using the ALJ's hypotheticals, the expert then testified that there were jobs that existed in significant numbers in the national and regional economies which he believed Mr. Thomas could perform on a full-time basis, including helper in the manufacturing industry, change person with slot-key machines in the amusement/recreation industry, and regular laborer in a store.[55]

---

[52] A.R. 370.

[53] A.R. 457.

[54] A.R. 465, 66.

[55] A.R. 467-69.

Based upon the hearing testimony and evidence in the record, the ALJ found that Mr. Thomas was not disabled as defined under the Social Security Act.[56]  On December 2, 2011, the Appeals Council denied Mr. Thomas' request for review.[57]

Mr. Thomas, now represented by counsel, timely sought judicial review of the ALJ's findings pursuant to 42 U.S.C. § 405(g) of the Social Security Act.  Mr. Thomas seeks reversal of the ALJ's decision, or in the alternative, remand to the ALJ for a rehearing.[58]

The Defendant opposes the requested relief, and maintains that the denial of benefits is supported by substantial evidence and free of legal error.[59]

## DISCUSSION

When conducting a Social Security disability determination, the ALJ follows a sequential five-step process.[60]  At Step 1, the ALJ determines whether the claimant is engaged in substantial gainful activity.[61]  At Step 2, the ALJ determines whether the claimant's alleged impairment is sufficiently severe to limit his ability to work.[62]  At Step 3, the ALJ determines whether the alleged impairment is listed in 20 C.F.R. § 404.1520.  If so, the

---

[56] A.R. 29.

[57] A.R. 5.

[58] Docket 1 at 2-3.

[59] Docket 18 at 12.

[60] 20 C.F.R. § 404.1520(a)(1).

[61] 20 C.F.R. § 404.1520(a)(4)(i).

[62] 20 C.F.R. § 404.1520(a)(4)(ii).

claimant is considered disabled and the inquiry ends.[63]  If not, the ALJ then determines the claimant's RFC, or the most work the claimant can still do despite his limitations.[64]  At Step 4, the ALJ uses the RFC to determine if the claimant can perform relevant work that he has performed in the past.[65]  At Step 5, the ALJ uses the RFC to determine if the claimant can engage in any other type of substantial gainful work that exists in the national economy.[66]  The claimant bears the burden on Steps 1 through 4; at Step 5, the burden shifts to the Social Security Commissioner.[67]

In this case, at Step 1 the ALJ determined that Mr. Thomas had not engaged in substantial gainful activity since July 1, 2005.[68]  At Step 2, the ALJ determined that Mr. Thomas had the severe impairments of "status-post optic neuritis of the right eye and a cognitive disorder."[69]  At Step 3, the ALJ determined that these impairments did not meet or medically equal one of the impairments listed in 20 C.F.R. §404, Subpart P, Appendix 1.[70]  The ALJ then determined that Mr. Thomas had the RFC to perform medium work, with a limitation "to work that requires only occasional balancing; no climbing of ladders, ropes, or

---

[63] 20 C.F.R. § 404.1520(a)(4)(iii).

[64] 20 C.F.R. § 404.1545.

[65] 20 C.F.R. § 404.1520(a)(4)(iv).

[66] 20 C.F.R. § 404.1520(a)(4)(v).

[67] *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

[68] A.R. 18.

[69] A.R. 18.

[70] A.R. 22.

scaffolding; the avoidance of concentrated exposure to extreme cold and the avoidance of moderate exposure to moving and hazardous machinery and unprotected heights; and avoidance of chemicals and airborne irritants such as fumes, dusts, and gasses."[71] The RFC also limited Mr. Thomas "to work that involves simple routine and repetitive tasks involving simple work related decisions with few if any workplace changes."[72] At Step 4, the ALJ determined that Mr. Thomas was unable to perform any of his past relevant work.[73] At Step 5, the ALJ determined that Mr. Thomas was able to perform work that existed in significant numbers in the national economy, specifically a "helper in manufacturing industry," "change keeper," and "vend[o]r for amusement facility[.]"[74] As a result, the ALJ concluded that Mr. Thomas was not disabled from July 1, 2005 through the date of his decision on January 13, 2011.[75]

## I.  Standard of Review.

The ALJ's denial of benefits to Mr. Thomas should be set aside only if the decision was based on legal error or not supported by substantial evidence.[76] A decision is based on

---

[71] A.R. 23.

[72] A.R. 23.

[73] A.R. 27.

[74] A.R. 28.

[75] A.R. 16.

[76] *Chaudhry v. Astrue*, 688 F.3d 661, 668 (9th Cir. 2012) (citing *Berry v. Astrue*, 622 F.3d 1228, 1231 (9th Cir. 2010)).

legal error if it is premised on improper legal standards.[77]  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[78]  If the evidence is equivocal, and "can support either affirming or reversing the ALJ's conclusion," this Court may not substitute its own judgment for that of the ALJ.[79]  But when conducting its review, this Court must "consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'"[80]

## II.   Analysis.

Mr. Thomas argues that the ALJ erred at Step 2 by failing to follow the proper procedure for evaluating Mr. Thomas' alleged mental impairments and by failing to develop the record with regard to a potential diagnosis of multiple sclerosis.  Mr. Thomas also argues that the ALJ erred by finding Mr. Thomas a non-credible witness, by improperly calculating the RFC, and by presenting incomplete hypotheticals to the vocational expert.

### A. The ALJ properly applied 20 C.F.R. § 404.1520a at Step Two.

20 C.F.R. § 404.1520a lays out a special four-step technique for an ALJ to use at Step 2 when evaluating alleged mental impairments.   Mr. Thomas asserts that the ALJ failed to

---

[77] *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

[78] *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

[79] *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citing *Flaten v. Sec., Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)).

[80] *Id.* (citing *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)).

correctly apply this technique.[81] In *Keyser v. Commissioner Social Security Administration*, the Ninth Circuit explained the correct manner for the ALJ to apply the process:

> [A]n ALJ must determine whether an applicant has a medically determinable mental impairment, [20 C.F.R.] § 404.1520a (b), rate the degree of functional limitation for four functional areas, *id.* § 404.1520a(c), determine the severity of the mental impairment (in part based on the degree of functional limitation), *id.* § 404.1520a(c)(1), and then, if the impairment is severe, proceed to step three of the disability analysis to determine if the impairment meets or equals a specific listed mental disorder, *id.* § 404.1520a(c)(2).[82]

The four functional areas are "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."[83] The ALJ's written decision "*must* incorporate the pertinent findings and conclusions based on the technique" and "*must* include a specific finding as to the degree of limitation in each of the functional areas."[84] Failure to do so requires remand.[85]

The ALJ assessed Mr. Thomas' abilities in the four functional areas as follows:

> In activities of daily living, the claimant has moderate restriction for the reasons noted below.

> In social functioning, the claimant has mild difficulties for the reasons noted below.

---

[81] Docket 17 at 34 (referencing *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721 (9th Cir. 2011)).

[82] *Keyser*, 648 F.3d at 725.

[83] 20 C.F.R. § 404.1520a(c)(3).

[84] *Keyser*, 648 F.3d at 725 (citing 20 C.F.R. § 404.1520a(e)(4) (emphasis added in *Keyser*)).

[85] *Id.* at 726.

With regard to concentration, persistence or pace, the claimant has moderate difficulties for the reasons noted below.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.[86]

Based on this assessment and the evidence in the record, the ALJ concluded that "[t]he 'paragraph C' criteria [we]re not satisfied[.]"[87] This Court finds that the ALJ properly followed the procedure required by 20 C.F.R. §404.1520a(e) and *Keyser* in evaluating Mr. Thomas' mental impairments.

### B. The ALJ failed in his duty to develop the record with regard to a potential MS diagnosis at Step Two.

Mr. Thomas argues that the ALJ failed to develop the record with regard to the potential MS diagnosis.[88] The ALJ has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered.[89] When the claimant is unrepresented, the ALJ must be especially diligent in exploring all relevant facts.[90] A further duty to develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.[91] While the claimant bears the burden of proving his disability at Steps One through Four, "[t]he ALJ's affirmative duty to

---

[86] A.R. 22.

[87] A.R. 22.

[88] Docket 17 at 17.

[89] *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).

[90] *Id.*

[91] *Mayes v. Massanari,* 276 F.3d 453, 459–60 (9th Cir. 2001).

assist a claimant to develop the record further complicates the allocation of burdens."[92] Failing in this duty implicates both the legal error standard and the substantial evidence standard: rejecting ambiguous evidence "without substantiated grounds for doing so constitute[s] legal error."[93]

Here, Mr. Thomas was not represented throughout the administrative process. While Mr. Thomas did not assert in his disability application that he had MS, there is considerable evidence in the record that supports a medical diagnosis of MS at odds with Mr. Thomas' naturopathic diagnosis of heavy metal contamination.

At the hearing, Mr. Thomas testified about Dr. Firestone's diagnosis as follows: "I have been to Harborview for worker's comp, and they say it's MS. The other two doctors say no, it's not MS . . ."[94] Mr. Thomas himself characterized this as a "conflict."[95] The ALJ asked Mr. Thomas about the last time he "saw a medical doctor, an M.D.—not an N.D., but an M.D."[96] Mr. Thomas responded "that'd be Harborview [Medical Center]. That's when they say I got MS."[97] The ALJ then asked if Mr. Thomas had undergone testing for MS, which Mr. Thomas

---

[92] *Tackett v. Apfel*, 180 F.3d 1094, 1098 n.3 (9th Cir. 1999) (emphasis removed) (citing 20 C.F.R. § 404.1512(d)).

[93] *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996).

[94] A.R. 459.

[95] A.R. 459

[96] A.R. 459.

[97] A.R. 459.

confirmed, testifying that "[t]hey gave me an MRI and everything[.]"[98]    The ALJ did not question Mr. Thomas any further about the MS diagnosis.

In the written decision, the ALJ described Dr. Firestone as having conducted a "consultative examination" of Mr. Thomas.[99]    Mr. Thomas argues that the use of this term misrepresents Dr. Firestone's report as the product of a Social Security Administration-requested consultation pursuant to 20 C.F.R. § 404.1519.    That regulation defines a "consultative examination" as "a physical or mental examination or test purchased for [the claimant] at the Social Security Administration's] request and expense."    The case law of this Circuit indicates that an ALJ should specify the context of a physician's exam.    In *Reddick v. Chater*, the Ninth Circuit clearly differentiated between "Social Security consulting examiners" and an "insurance carrier's consulting examiner."[100]    Dr. Firestone did not conduct a "consultative examination" as defined under the regulations; rather, he was the insurance carrier's consulting examiner. But Mr. Thomas has not identified case law indicating that a consultative examination ordered by the Social Security Administration should be given a different degree of weight from the opinion of an insurance carrier's consulting examiner. Thus, Mr. Thomas has failed to establish any harm resulting from the ALJ's characterization of Dr. Firestone 's report as a "consultative examination."

---

[98] A.R. 460.

[99] A.R. 24.

[100] *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).

But the ALJ did err in giving little or no weight to Dr. Firestone's MS diagnosis. Although the ALJ wrote that he gave Dr. Firestone's opinion great weight, the ALJ's findings indicate that this was in reference only to Dr. Firestone's conclusion that Mr. Thomas did not suffer from heavy metal poisoning and his description of Mr. Thomas' symptoms.[101] The ALJ characterized Dr. Firestone's MS diagnosis as an "outlier," explaining that it was a "single diagnosis" without any follow up exams.[102] And yet the ALJ noted a "pattern of multiple diagnos[e]s of both neurological and cognitive defects…which are hallmarks of potential multiple sclerosis."[103] This Court finds that the ALJ's determination that Mr. Thomas did not suffer from heavy metal poisoning was supported by substantial evidence; based on the administrative record, Mr. Thomas' symptoms were not consistent with that ailment.[104] Rather, Mr. Thomas' symptoms were consistent with a diagnosis of MS, although Mr. Thomas himself did not accept that diagnosis. Thus, the record was ambiguous with regard to Mr. Thomas' potential MS diagnosis. And the record is incomplete. For example, Dr. Firestone's report does not include the results of the underlying tests and MRI that were administered to Mr. Thomas at Harborview, but rather only includes Dr. Firestone's summary of the results. In these circumstances, the ALJ's duty to develop the record was triggered.

---

[101] *Compare* A.R. 26 (giving Dr. Firestone's opinion "great weight") *with* A.R. 27 (not including Dr. Firestone's MS diagnosis in summary of impairments).

[102] A.R. 24. *But see* A.R. 399.

[103] A.R. 24.

[104] *See, e.g.,* A.R. 155-60 (documents on metal poisoning causes and symptoms appended to Mr. Thomas' Recent Medical Treatment form).

The Defendant argues that even if the ALJ erred in not developing the record, any error was harmless because Mr. Thomas "did not meet his burden to show harm."[105]   But if the ALJ, upon developing the record, had determined that Mr. Thomas suffered from MS to a degree that qualified as a listed impairment under 20 C.F.R. § 404,[106] the ALJ would have found Mr. Thomas disabled at Step 3 of the analysis.  Thus, remand for further exploration of Mr. Thomas' potential MS diagnosis is clearly warranted.

### C. The ALJ erroneously found Mr. Thomas' testimony non-credible.

The ALJ found that Mr. Thomas' "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not credible,"[107] and noted that Mr. Thomas' "statements have been inconsistent with his allegations."[108]   Mr. Thomas argues the ALJ's adverse credibility assessment was erroneous because the ALJ did not take into consideration Mr. Thomas' mental confusion.[109]   The Defendant responds that "[t]he ALJ reasonably relied on the three medical opinions and Plaintiff's statements about his activities

---

[105] Docket 18 at 5.

[106] 20 C.F.R. Part. 404, Subpart P, App. 1, § 11.09 (MS is a listed impairment when diagnosed with "A. Disorganization of motor function as described in 11.04B; or B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.").

[107] A.R. 24.

[108] A.R. 26.

[109] Docket 17 at 19.

to reject Plaintiff's allegations that his functional abilities were more limited than the ALJ determined."[110]

In evaluating the credibility of a claimant's testimony about his subjective symptoms, an ALJ must conduct a two-part analysis. In the first part, known as the *Cotton* test,[111] the ALJ conducts a threshold inquiry to determine whether the claimant has presented "objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"[112] If so, and if there is no affirmative evidence that the claimant is malingering, the ALJ continues to the second part of the analysis, which requires him to give "specific, clear and convincing reasons" before rejecting the claimant's testimony.[113] An ALJ may use ordinary techniques of credibility evaluation, such as considering inconsistencies between the claimant's conduct and testimony and whether the claimant's daily activities are inconsistent with his alleged symptoms.[114]

Here, the ALJ found at the first step of the credibility analysis that Mr. Thomas' "medically determinable impairments could reasonably be expected to cause the alleged

---

[110] Docket 18 at 10.

[111] *Cotton v. Bowen*, 799 F.2d 1403 (9th Cir. 1986).

[112] *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).

[113] *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).

[114] *Id.* at 1112 (internal citations and quotation marks omitted).

symptoms[.]"[115]   However, at the second step, the ALJ found that Mr. Thomas' "statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not credible[.]"[116]   The ALJ provided several reasons for this finding.   First, he cited the "discrepancies within the medical record and between the claimant's testimony and the medical record."[117]   Specifically, the ALJ discussed Mr. Thomas' "assertion of metal toxicity" as unsupported by "medically acceptable . . . diagnostic techniques" and Mr. Thomas' unsupported assertion at the hearing that he had been diagnosed with diabetes.[118]   Second, regarding the potential MS diagnosis, the ALJ wrote that Mr. Thomas' "assertions of his capabilities as well as the findings of his examining physicians" did not indicate that his potential multiple sclerosis made him "incapable of performing all basic work activities."[119]   The ALJ also discussed Mr. Thomas' assertions regarding his vision difficulties, finding that the activities in which Mr. Thomas reported engaging—such as driving and hunting—as well as the vision tests administered by Dr. Kohnen, "belie[d] the claimant's assertion of a disabling visual impairment."[120]

---

[115] A.R. 24.

[116] A.R. 24.

[117] A.R. 24.

[118] A.R. 24.

[119] A.R. 25.

[120] A.R. 25 (referencing A.R. 344 (vision test results)).

The inconsistency between the medical evidence and Mr. Thomas' allegations of metal toxicity does not warrant an adverse credibility determination. The record contains objective medical evidence of MS which could reasonably be expected to produce Mr. Thomas' symptoms. The fact that Mr. Thomas believed metal toxicity to be the cause of his symptoms does not make his testimony as to the severity of those symptoms less credible. The ALJ also based his adverse credibility determination on the fact that Mr. Thomas "alleged at the hearing that he had been diagnosed with diabetes," but the record contained no such diagnosis.[121] At the hearing, Mr. Thomas gave the following testimony about an emergency room visit in or around 2002: "And then the second time I went back [to an eye doctor] to get eyeglasses, she sent me to the emergency room. And they came up – oh, you've got diabetes. And they pumped me full of steroids. And I said, I don't have diabetes."[122] Mr. Thomas then testified that "diabetes just didn't add up to what I was doing" and that, as a result of medical doctors' inability to help him, he turned to naturopathic doctors.[123] This Court finds that the ALJ's reliance on that evidence for a credibility determination against Mr. Thomas was not supported by substantial evidence.

"A claimant's credibility becomes important at the stage [of the five-step analysis] where the ALJ is assessing the residual functional capacity, because the claimant's

---

[121] A.R. 24.

[122] A.R. 448-49.

[123] A.R. 449.

subjective statements may tell of greater limitations than can medical evidence alone."[124]   In this regard, the ALJ found Mr. Thomas' assertions that he could not work to be not credible in light of the basic living activities he acknowledged doing.   The ALJ found the "claimant has no difficulty with his personal care needs or hygiene, cares for his teenage son, heats his home with firewood which he chops and hauls, prepares meals, cares for a dog, drives a vehicle, rides a bicycle, and reports no restrictions in his ability to walk distances."[125]   But claimants need not "vegetate in a dark room"[126] to be found eligible for benefits, and "should not be penalized for attempting to lead normal lives in the face of their limitations."[127]   And "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."[128]   While Mr. Thomas testified that he did the above-mentioned activities, he testified that he could only do so with pain and difficulty.[129]   Thus, this Court finds that the ALJ's adverse credibility determination based on the fact that Mr. Thomas' basic living activities were at odds with his assertion that he had difficulty doing work activities was not supported by substantial evidence.

---

[124] *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir. 2001).

[125] A.R. 26.

[126] *Molina*, 674 F.3d at 1113 (quoting *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir.1987)).

[127] *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

[128] *Fair v. Bowen,* 885 F.2d 597, 602 (9th Cir. 1989).

[129] A.R. 453.

The ALJ also relied on the failure of the medical evidence to support Mr. Thomas' alleged symptoms, stating that "at no point in the claimant's medical record is there any indication that the claimant's status-post optic neuritis causes disabling visual impairment."[130] But "finding a claimant's symptoms to be unsupported by objective medical evidence is not an appropriate basis for discounting testimony regarding subjective complaints.[131] Rather, the claimant's statements about the intensity, persistence, and limiting effects of the claimant's pain or symptoms are evaluated *in relation to* objective medical evidence.[132] Congress has "recognized the inability of medical science to objectively verify the extent of pain experienced by an individual."[133] This is because "symptoms can sometimes suggest a greater severity of impairment than is demonstrated by objective medical findings alone[.]"[134]

Dr. Kohnen's report describes Mr. Thomas' self-reported symptoms as occurring periodically, not consistently.[135] Thus, there is no apparent contradiction between Dr. Kohnen's report and Mr. Thomas' representations to support the ALJ's statement that Mr.

---

[130] A.R. 25.

[131] *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) ("a claimant need not present clinical or diagnostic evidence to support the severity of his pain" (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990)). *See also Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 884 (9th Cir. 2006) (citing *Light*).

[132] *Burch v. Barnhart,* 400 F.3d 676, 680 (9th Cir. 2005).

[133] *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir. 1991).

[134] *Id.*

[135] A.R. 341 ("He reports it *sometimes* is difficult to look at the speedometer. . . He says that *sometimes* he can't see out one eye or the other.") (emphasis added).

Thomas' reported activities "belie[d] the claimant's assertion of a disabling visual impairment."[136] As for the difference the ALJ found between Mr. Thomas' alleged hobbies and his vision problems, this Court finds that the record is not clear in this regard. For example, in a Function Report dated January 25, 2010, Mr. Thomas listed among his hobbies "TV, snowmachine, 4-wheeler, boating, hunting fishing," but said he now engaged in those activities "not at all- except for TV- since it is too difficult."[137] There and at other points in the record, there is some confusion between the hobbies Mr. Thomas reports engaging in currently versus the hobbies he has enjoyed in the past; it seems possible that Mr. Thomas engaged in activities such as hunting and fishing for the early portion of the period for which he claims disability, but stopped doing so as his symptoms worsened. Given this ambiguity in the record, the reasons the ALJ presented for rejecting Mr. Thomas' testimony as to his vision symptoms were not "specific, clear and convincing" as required within this Circuit.[138]

Moreover, the ALJ must give full consideration to all of the evidence presented relating to subjective complaints.[139] The ALJ did not adequately consider the evidence provided by the naturopaths, which substantiated Mr. Thomas' subjective symptom testimony.[140] While

---

[136] A.R. 25.

[137] A.R. 131.

[138] *Molina*, 674 F.3d at 1112 (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).

[139] *Bunnell,* 947 F.2d at 345.

[140] *See, e.g.*, A.R. 232 (Notes of Lisa Del Alba dated Feb. 5, 2008) ("eyes just 'blur out' . . . 'memory shot,' brain fuzzy"); A.R. 230 (Notes of Lisa Del Alba dated June 27, 2008 ("feeling really tired . . . has 'no circulation' in extremities"); A.R. 229 (Notes of Lisa Del Alba dated July 16, 2009) ("can't focus both eyes @ same time (episodically)"; "Right leg quits moving & rt arm episodically 'stops working'").

the diagnosis of a naturopathic doctor will not establish the existence of impairment, an ALJ should consider the evidence provided by naturopathic doctors when evaluating the severity of a claimant's impairment.[141] Here, the ALJ appropriately rejected the naturopathic doctors' ultimate opinions regarding the cause of Mr. Thomas' symptoms,[142] but did not provide reasons supported by substantial evidence for disregarding their reports and notes regarding Mr. Thomas' symptoms.

For the reasons described above, the Court finds that the ALJ's adverse credibility determination against Mr. Thomas based on the record at that time was not supported by substantial evidence.

### D. The RFC and hypothetical questions should be revisited on remand as warranted.

Mr. Thomas argues that the ALJ's RFC assessment and the hypothetical questions based on the RFC did not incorporate "gait instability," a classic symptom of MS, or "Dr. Lewy's assessment of markedly impaired as to interaction with the public."[143] Because this Court has determined that the ALJ erred in failing to develop the record with regard to Mr. Thomas' possible MS diagnosis and in finding Mr. Thomas' subjective symptom testimony non-credible based on the record before the ALJ at that time, the RFC and hypotheticals should be addressed anew on remand as warranted.

---

[141] 20 CFR § 404.1513(d)(1) (listing naturopaths as acceptable sources of "evidence . . . to show the severity of your impairment(s) and how it affects your ability to work.").

[142] A.R. 27.

[143] Docket 17 at 38.

**CONCLUSION**

For the reasons discussed above, this matter is REVERSED and REMANDED for further proceedings consistent with this Decision and Order.


DATED at Anchorage, Alaska this 8th day of January, 2013.


/s/ Sharon L. Gleason
United State District Judge